NMA/RN/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -               10 CR 147 (S-4) (SLT)

MICHAEL PERSICO, <u>et al.</u>,

          Defendants.

- - - - - - - - - - - - - -X


## THE GOVERNMENT'S MOTION FOR AN <u>ANONYMOUS AND PARTIALLY SEQUESTERED JURY</u>


                        LORETTA E. LYNCH
                        United States Attorney
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York  11201


Nicole M. Argentieri
Rachel Nash
Allon Lifshitz
Assistant U.S. Attorneys
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT.. . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . 2

I.   The Racketeering Conspiracy. . . . . . . . . . . . 2

     A.   The Racketeering Enterprise.. . . . . . . . . 2

     B.   The Defendants and the Racketeering Acts. . . 3

          1.   Murder of Joseph Scopo.. . . . . . . . . 5

          2.   Murder of Michael Devine.. . . . . . . . 6

          3.   Conspiracy to Murder John Doe #3.. . . . 6

          4.   Witness Tampering. . . . . . . . . . . . 7

          5.   Extortion of Jon Doe #2. . . . . . . . . 7

II.  The Defendants' Violence, Obstruction and Influence. . . . 7

     A.   Violence. . . . . . . . . . . . . . . . . . 8

     B.   Obstruction.. . . . . . . . . . . . . . . . 9

     C.   Influence.. . . . . . . . . . . . . . . . . 10

III. The Colombo Family's History of Obstruction. . . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . 17

I.   Anonymity Is a Well-Established Means of
     Ensuring the Impartiality of a Jury. . . . . . . . . 17

     A.   Defendants With Ties to Organized Crime.. . . . . . 19

     B.   Media Coverage. . . . . . . . . . . . . . . 22

II.  There Is Strong Reason to Believe That
     the Jury Needs Protection in this Case.. . . . . . . . 24

          A.   Jurors' Reasonable Fear of
               Repercussions May Affect Impartiality. . . . . 25

          B.   Danger of Obstructive Conduct. . . . . . . . 26

III.  The Use of an Anonymous and Partially Sequestered
      Jury Will Not Deprive the Defendants of the
      Opportunity for Meaningful Participation in
      Jury Selection or Diminish Their
      Presumption of Innocence.. . . . . . . . . . . . . . . 27

          A.   Empaneling an Anonymous Jury Does Not
               Burden the Defendants' Ability to Make
               Informed Choices During Jury Selection.. . . . 27

          B.   The Court Can Explain the Reasons for
               Anonymity and Partial Sequestration to
               Prospective Jurors in Neutral Terms That
               Will Diminish the Risk of Prejudice
               to the Defendants. . . . . . . . . . . . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . 31

<u>PRELIMINARY STATEMENT</u>

The government moves to empanel an anonymous jury for the trial of this case.  As set forth below, the defendants include members and associates of the Colombo organized crime family of La Cosa Nostra (the "Colombo family"), which has endeavored for decades to interfere with the fair administration of justice.  Therefore, the government respectfully requests that (1) the identities of all prospective jurors, including their names, addresses, and places of employment, not be revealed to either the parties or their attorneys, and (2) from the time each juror is empaneled until the conclusion of the trial, the jurors be escorted by representatives of the United States Marshals Service to and from the courthouse each day and at all times during recesses.  These precautions are necessary to ensure that the jurors are free from interference by the defendants and their criminal associates.  Moreover, these precautions will not deprive the defendants of their right to meaningful voir dire or cause any other prejudice.

1

STATEMENT OF FACTS

I.   The Racketeering Conspiracy

     A.   The Racketeering Enterprise

          Most of the defendants in this case have longstanding relationships with the Colombo family, a violent criminal enterprise with a lengthy history of jury tampering and obstruction of justice.

          The fourth superseding indictment ("Indictment" or "Ind.") alleges that the Colombo family operated through various "crews," which consisted of Colombo family members (sometimes referred to as "soldiers") and associates. (Id. ¶ 5.) Each crew was headed by a "captain," who in turn reported to the family hierarchy, including the "boss," who was assisted by an "underboss" and a "consigliere" in supervising and protecting the family's overall activities. (Id. ¶¶ 4-5.) Together, the boss, underboss and consigliere were the crime family's "administration." (Id. ¶ 4.)

          The principal purpose of the Colombo family was to generate money for its members and associates through a wide range of criminal activities, including drug trafficking, robbery, extortion, fraud, bribery, embezzlement, illegal gambling and loansharking. (Id. ¶ 8.) To further these criminal moneymaking activities, Colombo family members and associates engaged in additional crimes, some involving the use and

threatened use of physical violence, including murder.  (Id.)  In
addition, members and associates of the Colombo family at times
used the resources of the Colombo family to settle personal
grievances and vendettas, sometimes with the approval of higher-
ranking members of the Colombo family.  (Id. ¶ 9.)  "For those
purposes, members and associates of the [Colombo family] were
asked and expected to carry out, among other crimes, acts of
violence, including murder and assault."  (Id.)

     The Indictment further alleges that "[t]he members and
associates of the Colombo crime family engaged in conduct
designed to prevent government detection of . . . their illegal
activities."  (Id. ¶ 10.)  This conduct included "a commitment to
murdering persons, particularly members or associates of
organized crime families, who were perceived as potential
witnesses against members and associates of the enterprise."
(Id.)

    B.   <u>The Defendants and the Racketeering Acts</u>

     The defendant Theodore N. Persico, Jr. ("Persico,
Jr."), was a high-ranking captain in the Colombo family.  The
defendant Thomas Petrizzo was a soldier in the Colombo family.
The defendants Edward Garofalo, Jr., Francis Guerra, Michael J.
Persico ("Persico") and Anthony Preza were associates in the
Colombo family.  Persico, however, is the son of Carmine "The
Snake" Persico, the official boss of the Colombo family.  In

3

addition, Guerra was scheduled to be inducted into the Colombo family in December 2010, but the induction ceremony was canceled after the Colombo family came to believe the ceremony was the subject of law enforcement surveillance.

Persico, Jr., Petrizzo, Garofalo, Guerra, Persico and Preza are all charged in Count One of the Indictment with racketeering conspiracy.  In particular, the Indictment charges that from approximately January 1987 to June 2011, these defendants and others were employed by or associated with the Colombo family and "conspire[d] to . . . conduct and participate, directly and indirectly, in the conduct of the affairs of [the Colombo family] through a pattern of racketeering activity[.]" (Ind. ¶ 16.)

The alleged racketeering acts include the murder of Joseph Scopo (alleged against the defendants Persico, Jr., Guerra and Persico), the murder of Michael Devine (alleged against the defendant Guerra), the conspiracy to murder John Doe #3 (alleged against the defendants Garofalo and Persico, Jr.), witness tampering (alleged against the defendants Garofalo and Persico, Jr.), the extortion of John Doe #2 (alleged against Persico and Preza) and other crimes, all in connection with the aforementioned defendants' membership in and association with the Colombo family.

4

1.   <u>Murder of Joseph Scopo</u>

As alleged in Racketeering Act Three of Count One, between June 20, 1991 and October 20, 1993, Persico, Jr., Guerra and Persico, together with others, conspired to murder, and in fact murdered, Joseph Scopo.  Scopo was murdered as he got out of the passenger seat of a vehicle parked in front of his residence in Ozone Park, Queens, on October 20, 1993.  Scopo was murdered in connection with the Colombo family war, during which the Colombo family split into two feuding factions, one loyal to Victor "Vic" Orena (the "Orena faction") and the other loyal to Carmine "the Snake" Persico (the "Persico faction").[1]  Persico, Jr., Guerra and Persico were loyal to the Persico faction.  Scopo was, at the time of his murder, the underboss of the Colombo family and was loyal to the Orena faction.  He was the final casualty in the Colombo family war.

Guerra, Persico and a cooperating witness (hereinafter, "CW-1"), together with others, planned and carried out the Scopo murder at the direction of Persico, Jr.  Although Persico, Jr., was incarcerated at the time of the murder, he obtained permission to attend the August 1993 wake of his grandmother, where he instructed Guerra, CW-1 and others to murder Scopo in order to win the war against the Orena faction.  Persico provided

---

[1]   Carmine "the Snake" Persico is Persico's father and Persico, Jr.'s uncle.

guidance to Guerra, CW-1 and others regarding the murder.  For example, Persico insisted that Guerra and CW-1 carry out the murder prior to the release of Persico's brother, Alphonse "Allie Boy" Persico.  Persico also arranged the firearms to be used in the Scopo murder.

>    2.  <u>Murder of Michael Devine</u>

As alleged in Racketeering Act Four of Count One, on June 24, 1992, Guerra, together with other associates of the Colombo family, conspired to murder, and in fact murdered, Michael Devine.  Devine was murdered in the underground garage of the apartment building in Staten Island where he lived.  He was murdered in retaliation for dating the wife of Alphonse "Allie Boy" Persico (Persico's brother and Persico, Jr.'s cousin), who was incarcerated at the time.  Guerra admitted his participation in the murder to multiple cooperating witnesses.

>    3.  <u>Conspiracy to Murder John Doe #3</u>

As alleged in Racketeering Act Eight of Count One, on May 25, 2004, Garofalo and Persico, Jr., conspired to murder John Doe #3.  In a conversation that was recorded on that date, Garofalo and Persico, Jr., discussed retaliating against John Doe #3, who they believed had spoken disrespectfully about them.  During that conversation, as they drove to see another Colombo family member in order to seek permission to kill John Doe #3, Garofalo told one of the passengers in the car to "clean" the

bullets of fingerprints from the gun that Persico, Jr., was carrying.

    4.  <u>Witness Tampering</u>

As alleged in Racketeering Act Ten of Count One, on November 15, 2004, the defendants Garofalo and Persico, Jr., intimidated and threatened John Doe #5 in order to prevent him from reporting a violent crime in-aid-of racketeering to law enforcement.  In particular, Garofalo was recorded pursuant to a court-authorized wiretap discussing his assault of John Doe #5 and how he had threatened John Doe #5, through John Doe #5's employer, to prevent John Doe #5 from reporting the assault to law enforcement.

    5.  <u>Extortion of John Doe #2</u>

As alleged in Racketeering Act Twelve of Count One and charged in Counts Four and Five, between June 2007 and June 2009, Persico and Preza conspired to extort, and in fact extorted, John Doe #2.  In particular, Persico and Preza, relying on their association with the Colombo family, induced John Doe #2 to refrain from operating a commercial business by instilling in him a fear that if he operated that business, he or others would suffer physical or economic harm.

II.  The Defendants' Violence, Obstruction and Influence

The defendants' commitment to using violence and threats of violence to protect their interests and to obstruct

justice is well established, as is their influence within the Colombo family.

A.   Violence

The defendants have no reservations about using violence to advance their interests.  Persico, Jr., Guerra and Persico participated in the murder of Joseph Scopo so that the Persico faction could obtain control of the Colombo family. Guerra participated in the murder of Michael Devine in retaliation for Devine dating the wife of a powerful member of the Colombo family.  Garofalo and Persico, Jr., conspired to murder John Doe #3 because they believed he had spoken disrespectfully about them.

In addition to the charged crimes, Garofalo has assaulted many individuals.  Specifically, Garofalo told a cooperating witness that he used a baseball bat to assault an employee and a business associate whom he suspected of cheating him in the late 1990s.  Garofalo also bragged in or about late 2003 or early 2004 that he had beaten another employee who had complained to Garofalo about his wages until that employee was unconscious, and then directed that the victim be dragged into the street so that he would not die on the business premises.  In 2004 or 2005, Garofalo also assaulted another employee who had complained to the union about his wages, hitting him on the head with a broomstick.

8

B.    Obstruction

        The defendants' personal commitment to using violence and threats of violence to obstruct justice is also well established.  In 2004, Garofalo and Persico, Jr., threatened John Doe #5 in order to prevent him from telling law enforcement that Garofalo had assaulted him.  In addition, Persico, Jr., has recently advised his co-conspirators that, in contemplation of a future arrest, that he planned to "go out in a blaze," referring to killing people suspected of cooperating.  In particular, on January 23, 2010, James Bombino, a former co-defendant in this case[2], advised a cooperating witness, in a conversation that was consensually recorded, that "Teddy [referring to Persico, Jr.] told him to give him a list because, before Teddy goes, he is going to take care of everybody.  Teddy said to give him the list of drivers with big mouths, give him this, give him that, there is no doubt he is going out in a blaze."

        Persico, Jr., also has a history of witness tampering. In May 2005, he was arrested on racketeering and extortion charges.  (United States v. Persico, Jr., et al., 05 CR 351 (CBA), Docket Entry No. 10.)  Following Persico, Jr.'s, arrest, a private investigator representing Persico, Jr., contacted Persico, Jr.'s, extortion victim and asked the victim to sign a

----

        [2]   On March 4, 2011, Bombino pled guilty to racketeering conspiracy.  (Docket Entry Nos. 222, 225.)

9

false affidavit stating that none of the defendants in that case, including Persico, Jr., had threatened the victim.  (Id., Docket Entry No. 47 at 4-7.)  Based on this conduct, Persico, Jr., was indicted for witness tampering.[3]  (Id., Docket Entry No. 68 ¶¶ 26-27.)

C.    Influence

In addition, it is well established that the defendants have strong influence within the Colombo family.  As noted above, Persico, Jr., was a high-ranking captain in the Colombo family, and Persico is the son of the official boss of the Colombo family.  In light of his power and influence, Persico has the ability to direct others to commit crimes or threaten acts of violence.  For example, as part of the extortion that is alleged in Racketeering Act Nineteen of Count One and charged in Counts Eighteen and Nineteen, Persico directed his co-defendant James Bombino to threaten employees and the owner of Testa Corporation in order to ensure that Testa Corporation would pay the company that Bombino, Persico and Persico, Jr. controlled.

In addition, Garofalo and Guerra, though associates, are influential within the Colombo family.  Patrick Bombino, a trusted Colombo associate with close ties to Persico, Jr., told a

---

[3]    The charge was dismissed at sentencing upon motion of the government after Persico, Jr., pled guilty to racketeering conspiracy.  (Judgment, United States v. Persico, Jr., et al., 05 CR 351 (CBA), Docket Entry No. 90 at 1.)

cooperating witness that Garofalo "did a couple nice things during the war," which the Persicos consider "an honor, so to speak."  The cooperating witness understood the reference to "nice things during the war" and "an honor" to refer to murder committed on behalf of the Persico faction during the Colombo family war in the early 1990s.  This information was later confirmed to the cooperating witness by Patrick Bombino's brother, former co-defendant James Bombino.

As noted previously, Guerra also committed a significant crime during the Colombo family war: the murder of Joseph Scopo, which helped the Persico faction win the war.  In addition, as alleged in Racketeering Act Twenty, between May 2010 and August 2010, Guerra conspired to obtain money by extortion from John Doe #12.  In committing this crime, a coconspirator assaulted John Doe #12, who was perceived to have stolen a recipe from a restaurant owned by Guerra's wife's family, which theft Guerra felt was disrespectful.  This crime demonstrates Guerra's current position of influence within the Colombo family, as does the fact that Guerra was recently selected for induction into the Colombo family.

Based on their positions of influence within the Colombo family, there is a significant danger that the defendants will direct others to interfere with the trial in this case.

11

III. <u>The Colombo Family's History of Obstruction</u>

The Colombo family has a history of jury tampering that spans decades, particularly in the Eastern District of New York. In 1986, 1994 and 2007, when Persico's brother Alphonse "Allie Boy" Persico, at one time the acting boss of the Colombo family, was tried on RICO charges, the courts used anonymous juries. In the 1994 case, Judge Sifton ordered an anonymous jury because, among other things, a credible government source "advised agents of the Federal Bureau of Investigation that a high ranking member of the Persico faction has said that efforts would be made to tamper with the jury in order to avoid a conviction." <u>United States v. Persico</u>, 1994 WL 150837, at *2 (E.D.N.Y. Apr. 20, 1994). In 2007, Persico and another Colombo family member, John DeRoss, were convicted of murder and of tampering with three witnesses in regard to the murder investigation.

A further example showing the need for an anonymous jury in this case is the basis for obstruction of justice charges in <u>United States v. Russo</u>, 98 CR 817 (DGT), a case before Judge Trager. In 1994, defendant Andrew Russo, a long-time Colombo family member, made efforts to contact one of the anonymous jurors in a Colombo family case tried before Judge Sifton in the hope of influencing the verdict. When the government began to investigate the attempted jury tampering, Russo and a coconspirator hid a key witness so that she could not be served

12

with a grand jury subpoena. Russo and the primary coconspirator, Dennis Hickey, were ultimately indicted for and convicted of, inter alia, endeavoring to impede the due administration of justice, in violation of 18 U.S.C. § 1503.

The Russo case is alarming for several reasons. First, it shows that the Colombo family is dedicated to jury tampering as a trial strategy. If a regular jury had been used in Russo, it is almost certain that the jurors would have been located, contacted, and threatened or bribed. Second, it proves that the trial process is not safe from Colombo family efforts to obstruct justice even with an anonymous jury. Thus, escorting the jury and vigilance in other regards is a necessity.

The Colombo family has also liberally used the sanction of murder to eliminate suspected informants and federal witnesses who could help bring their leaders and others in their crime family to justice. The late Anthony Coluccio (1989), Thomas G. Ocera (1989), Gioachino "Jack" Leale (1991) and James Randazzo (1993) were all murdered by other Colombo family members who were concerned that they were "weak links" who might cooperate with the government. Carmine Imbriale, a Colombo family associate who became a cooperating witness, was also the target of a murder conspiracy among members and associates of the Colombo family. A member of the Colombo family sought to murder the mother of Joseph Ambrosino after he agreed to cooperate. Then-Colombo

13

family acting captain Gregory Scarpa, Jr., ordered the murder of numerous persons who he believed might become or had become witnesses against his crew.

This predisposition for eliminating potential witnesses remains firmly in place. In October 2000, Frank Leto, a soldier in the Colombo family, was intercepted during court-authorized electronic surveillance discussing with fellow Colombo soldier Campione, in chilling terms, how the Colombo family should handle witnesses who cooperate with the government. Leto stated, "[A]nybody who becomes a rat, kill their wife, kill their kids, kill 'em all. The next [expletive], the next time, you gotta think, hello, look what they do to rats and families." This conversation was intercepted in Long Island, New York on October 24, 2000. Furthermore, in July 2001, members and associates of the Colombo family attempted to murder Colombo family soldier Joseph Campanella because they perceived that he was cooperating with law enforcement.[4]

For example, in 2007, then-Colombo family street boss Thomas Gioeli, Colombo family captain Michael Catapano and others attempted to tamper with a witness whom they believed had agreed to testify against an attorney who had been charged in Supreme

---

[4]     In Spring 2004, Colombo family member Vincent "Chickie" DeMartino and Colombo family associate Giovanni Floridia were convicted for their participation in this attempted murder.  In Winter 2006, Colombo family associate Michael Spataro was convicted for his role in the attempted murder.

Court, New York County, with, inter alia, promoting prostitution. The Colombo family intervened in that prosecution because the attorney had previously proposed a joint gambling venture to members of the family and, accordingly, represented a potentially lucrative source of revenue for the family.  Specifically, Catapano had the following colloquy with a cooperating witness ("CW-2"), who was equipped with a recording device:

| | |
|---|---|
| CATAPANO: | Oh, I gave him that thing for the lawyer. |
| CW-2: | Who? |
| CATAPANO: | The lawyer.  Remember? |
| CW-2: | Okay. |
| CATAPANO: | They got it.  So, now they are suppose to take care of it. |
| CW-2: | Okay. |
| CATAPANO: | Alright.  For that kid, you know the one that's gonna rat him out.  For [the attorney]. |
| CW-2: | Oh, oh, I got a million things going on.  Okay. |
| CATAPANO: | I gave the paper to where it had to go. |
| CW-2: | Right, they knew the guy? |
| CATAPANO: | They were going to go last week, so I'm sure they went. |
| CW-2: | They went to take care of it? |
| CATAPANO: | They supposedly did. |

15

CW-2 understood that Catapano had given a piece of paper that contained contact information for the father of the perceived cooperating witness to Gioeli, the person to whom Catapano reported.  CW-2 further understood that Gioeli would ensure that a representative of the Colombo family contacted the father of the perceived witness to ensure that he did not cooperate with law enforcement.  Later in the recording, Catapano assured CW-2 that Catapano and CW-2 would get "credit" for passing along the contact information about the perceived cooperating witness.

Additionally, apart from specific instances of interference with the judicial process by the Colombo family, it has become evident after several trials in this district, see, e.g., Orena, 32 F.3d at 704; United States v. Brady, 26 F.3d 282 (2d Cir. 1994); United States v. Amato, 15 F.3d 230 (2d Cir. 1994); United States v. Sessa, 92 CR 351 (JBW); Persico, 92 CR 351 (S-9)(CPS); Malpeso, 93 CR 1365 (S-2)(RJD); Scarpa, 94 CR 1119 (RR), that the Colombo family is a large criminal organization, thereby increasing the likelihood that the defendants or their criminal confederates will be able to locate a juror and will possess the means to intimidate or bribe that juror.  These trials have featured testimony from numerous accomplice witnesses detailing the large number of members and associates and the breadth, scope, and boldness of the Colombo

family's criminal activities, including its history of violence and obstruction.

ARGUMENT

I.    Anonymity Is a Well-Established Means of
      Ensuring the Impartiality of a Jury

        The Second Circuit has long recognized that anonymous juries are often necessary to protect the integrity of trials and to ensure juror impartiality.  This is especially true where jurors may be unwilling to return an impartial verdict due to fear of retribution.  See, e.g., United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987) (upholding the decision to empanel an anonymous jury in the racketeering and bribery case of Alphonse "Allie Boy" Persico, "a trusted adviser and an initiate member of the [Colombo] Family," based on "the violent acts alleged to have been committed in the normal course of Colombo Family business, the Family's willingness to corrupt and obstruct the criminal justice system, and the extensive publicity" generated by the case); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994) (upholding the decision to empanel an anonymous jury in the racketeering, tax fraud and conspiracy case against the boss of the Luchese family); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993) ("Locascio I") (upholding the decision to empanel a sequestered anonymous jury in the RICO and murder case against the boss and underboss of the Gambino family based, in part, on "the government's evidence of

17

previous instances of jury tampering by [Gambino boss John] Gotti and his associates").

The Second Circuit has adopted a two-step process for determining whether to empanel an anonymous jury. A district court should first determine whether there is strong reason to believe that the jury needs protection. If there is, the court should then take reasonable precautions to minimize any prejudice that an anonymous jury might entail. See, e.g., United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Barnes, 604 F.2d 121, 141 (2d Cir. 1979). Within those general parameters, the decision to use an anonymous jury is left to the sound discretion of the trial court. See, e.g., Paccione, 949 F.2d at 1192; United States v. Maldonado-Rivera, 922 F.2d 934, 971 (2d Cir. 1990).

The Second Circuit has identified five factors relevant to determining the propriety of empaneling an anonymous jury: (1) the seriousness of the charges; (2) the dangerousness of the defendant; (3) the defendant's ability to interfere with the jury, either by himself or through a criminal organization of which he is a member; (4) previous attempts to interfere with the judicial process by the defendant or his associates; and (5) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that

18

might impair their ability to be fair.  See Thai, 29 F.3d at 801;
Paccione, 949 F.2d at 1192-93; United States v. Tutino, 883 F.2d
1125, 1132 (2d Cir. 1989); Persico, 832 F.2d at 717; see also
United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994) (court's
decision to empanel anonymous jury may be based on government's
pre-trial proffer).

    A.   Defendants With Ties to Organized Crime

       The Second Circuit has repeatedly approved the use of
anonymous juries in cases involving defendants with ties to
organized crime.  See, e.g., Amuso, 21 F.3d at 1264-65;
Locascio I, 6 F.3d at 946-47; United States v. Vario, 943 F.2d
236, 240 (2d Cir. 1991); Persico, 832 F.2d at 717.  The Second
Circuit has emphasized, however, that the mere fact that a case
involves organized crime does not, by itself, justify use of an
anonymous jury unless there is "something more."  Vario, 943 F.2d
at 241.  "This 'something more' can be a demonstrable history or
likelihood of obstruction of justice on the part of the defendant
or others acting on his behalf or a showing that trial evidence
will depict a pattern of violence by the defendant and his
associates such as would cause a juror to reasonably fear for his
own safety."  Id.

       Indeed, the charged offenses need not even involve acts
of violence in order to necessitate an anonymous jury.  In United
States v. Locascio, 357 F. Supp. 2d 558 (E.D.N.Y. 2005)

("Locascio II"), the court granted the government's motion for an anonymous and partially sequestered jury in a case involving a complex fraud scheme perpetrated by several Gambino family members and associates.  In that case, the court found that "[t]he concern . . . is not that anonymity is necessary to assuage jurors' fears for their personal safety.  Rather, the concern is that if jurors identities are revealed they can easily be contacted and offered bribes." Id. at 561.  Thus, the court found that the seriousness of the charges coupled with "the ability of the defendants to enlist the resources of the Gambino crime family, an organization with a documented history of juror intimidation" supported anonymity and partial sequestration.  Id. at 563.  Moreover, there is no requirement that the particular defendants on trial have a demonstrated history of jury tampering to necessitate an anonymous jury. See United States v. Persico, 92 CR 351, 1994 WL 150837, *1-2 (E.D.N.Y. Apr. 20, 1994) (rejecting defendants' argument that an anonymous jury was not warranted because there was no evidence that the defendants had personally engaged in jury tampering).

Courts in this district have repeatedly empaneled anonymous juries in organized crime cases.  For example, in United States v. Souza, et al., 06 CR 806 (SLT), this Court granted the government's motion for an anonymous and partially sequestered jury in the trial of several members of the Colombo

family.  (Souza, Docket Entry No. 209.)  The present case may
present even more compelling circumstances.  In granting the
motion in Souza, this Court explained that the requested
precautions were appropriate in part because the charges in that
case were serious, and included narcotics trafficking, robbery,
loansharking, illegal gambling and extortion.  (Id. at 5.)  In
the present case, the charges are even more serious because they
include two murders, a murder conspiracy and witness tampering.
See also United States v. Gioeli and Saracino, 08 CR 240 (BMC),
Docket Entry No. 1195 (granting government motion for anonymous
and partially sequestered jury in trial of Colombo family soldier
Dino Saracino and former Colombo family street boss Thomas
Gioeli); United States v. Antico, 08 CR 559 (CBA), 2010 WL
2545877 (E.D.N.Y. June 11, 2010) (granting motion for anonymous
and partially sequestered jury in trial of former Genovese family
captain Anthony Antico); United States v. Cacace, 321 F. Supp. 2d
532 (E.D.N.Y. 2004) (Johnson, J.) (granting government's request
for an anonymous, fully escorted and partially sequestered jury
for high-ranking Colombo family member Joel Cacace).  See also
United States v. Persico, 04 CR 911 (S-1) (2007 trial) (Seybert,
J.) (granting government's request for an anonymous, fully
escorted and partially sequestered jury (Colombo family)); United
States v. Spataro, 04 CR 911 (S-1) (Johnson, J.) (granting
government's request for anonymous and partially sequestered jury

21

(Colombo family)); <u>United States v. Locascio</u>, 357 F. Supp. 2d 558
(E.D.N.Y. 2005) (Amon, J.) (same (Gambino family)); <u>United States
v. DeMartino</u>, 03 CR 285 (Dearie, J.) (anonymous jury (Colombo
family)); <u>United States v. John DeRoss</u>, 01 CR 56 (RR) (anonymous
jury (Colombo family)); <u>United States v. Gregory Scarpa, Jr.</u>, 94
CR 1119 (Raggi, J.) (anonymous jury (Colombo family)); <u>United
States v. Amuso</u>, 90 CR 446 (Nickerson, J.) (fully anonymous and
fully sequestered jury (Luchese family)); <u>United States v.
Legrano</u>, 93 CR 1231 (Ross, J.) (fully anonymous and partially
sequestered jury (Colombo family)); <u>United States v. Cutolo</u>, 93
CR 1230 (Nickerson, J.) (same (Colombo family)); <u>United States v.
Bisaccia</u>, 93 CR 479 (Glasser, J.) (same; <u>United States v.
Malpeso</u>, 93 CR 1365 (Dearie, J.) (same (Colombo family)); <u>United
States v. Persico</u>, 92 CR 351 (Sifton, J.) (same (Colombo
family)); <u>United States v. Orena</u>, 93 CR 1366 (Korman, J.) (same
(Colombo family)); <u>United States v. Orena</u>, 92 CR 351 (S-4)
(Weinstein, J.) (three trials) (same, except jury only partially
anonymous (Colombo family)), <u>aff'd</u>, 32 F.3d 704 (2d Cir. 1994).

    B.   <u>Media Coverage</u>

     The present case has already attracted significant
media attention.  See, e.g., John Marzulli, N.Y. Daily News, "Mob
Family Man Michael Persico Faces WTC Racketeering Rap" (March 9,
2010) (available at http://www.nydailynews.com/news/crime/

mob-family-man-michael-persico-faces-wtc-racketeering-rap-article
-1.171890); Associated Press, N.Y. Post, "Feds Charge 8 with
Extortion at WTC Site" (March 9, 2010) (available at
http://www.nypost.com/p/news/local/manhattan/feds_charge_with_ext
ortion_at_wtc_7pHRxUCLcJr04rkneYmOxH); Reuven Fenton, N.Y. Post,
"Plea in Mob Hit" (August 26, 2011) (available at
http://www.nypost.com/p/news/local/plea_in_mob_hit_fteZVG03DZ80qO
bOK3bm5O); John Marzulli, N.Y. Daily News, "Alleged Mobster
Accused of Two Hits and Pizzeria Shakedowns Denied Bail" (August
30, 2011) (available at http://www.nydailynews.com/news/crime/
alleged-mobster-accused-hits-pizzeria-shakedowns-denied-bail-arti
cle-1.950931); Mitchel Maddux, N.Y. Post, "La Cosa 'No'Stra"
(October 31, 2011) (available http://www.nypost.com/p/news/local/
la_cosa_no_stra_LH9RdDb0S9tLBirtD19ZDM).  The case is likely to
attract more media attention in the weeks leading up to and
during the trial.

        In an organized crime matter, press attention is of
particular concern for two reasons: (1) the danger that members
and associates of the Colombo family will learn identifying
information about jurors through press reports, and (2) the
jurors' fear that press reports could lead to their
identification by the Colombo family and the effect of that fear
on their deliberations.  Pre-trial publicity is a legitimate
basis for impaneling an anonymous jury because such publicity can

"enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public." <u>Vario</u>, 943 F.2d at 240 (<u>quoting</u> <u>Persico</u>, 621 F. Supp. at 878).  This, of course, is of great concern where, as here, the trial involves a violent criminal enterprise with members sworn to engage in illegal conduct, including obstruction of justice, in order to preserve its existence.  Indeed, courts have ordered anonymous juries in cases with extensive media coverage, even though the defendants had no documented history of jury tampering.  <u>United States v. Chammies</u>, 864 F.2d 16, 18 (3d Cir. 1988) (affirming sequestered jury in trial of judge accused of extortion on ground that trial would generate "significant amounts of publicity" that would interfere with the jury's ability to remain impartial).

II.   There Is Strong Reason to Believe That
      <u>the Jury Needs Protection in this Case</u>

          The specific charges contained in the Indictment, the defendants' prior attempts to obstruct justice, and the defendants' long-standing membership in and/or association with the Colombo family are more than sufficient to necessitate an anonymous jury in this case.  Not only is there a real risk of juror tampering, but the nature of the case and the character of the government's evidence may impact the jury absent anonymity. Even in the absence of threats or other specific obstructive

24

conduct, jurors whose identities are made public may reasonably fear repercussions if they vote to convict.

> A.   Jurors' Reasonable Fear of
>      Repercussions May Affect Impartiality

The defendants stand charged as members and associates of a notoriously violent criminal enterprise.  The Indictment charges, and the government will prove, that the Colombo family regularly engages in crimes such as "drug trafficking, robbery, extortion, fraud, bribery, embezzlement, illegal gambling and loansharking" as well as "threatening economic injury and using and threatening to use physical violence, including murder." (Indictment ¶ 8.)  The government will also prove that members and associates have "used the resources of the family to settle personal grievances and vendettas" and that "[f]or those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault."  (Id. ¶ 9.)  Furthermore, the Colombo family has demonstrated "a commitment to murdering persons, particularly members or associates of organized crime families, who were perceived as potential witnesses against members and associates of the enterprise."  (Id. ¶ 10.)

At trial, the government's witnesses will testify about the Colombo family's involvement in brazen crimes, including murders committed by the defendants.  Through these witnesses, the government will also elicit testimony regarding the meaning

25

of association with and membership in the Colombo family, including the absolute necessity of committing serious crimes, such as murder and assault, when directed by a superior. Evidence will also be presented regarding the Colombo family's prohibition against cooperation with law enforcement as well as the repercussions of such cooperation, namely death. Furthermore, even if the risk of obstructive conduct by the defendants or their associates is discounted, there is a reasonable basis to believe that the nature of the evidence, with regard to both the enterprise and the specific crimes charged, will affect jurors absent anonymity.

B.   Danger of Obstructive Conduct

In addition, the history of the Colombo family's interference with the judicial process and the past attempts by the defendants and their associates to obstruct justice demonstrate that the defendants have the ability to interfere with the jury empaneled in this case.  These acts, coupled with the defendants' strong ties to organized crime, amply justify anonymity in this case.  See Vario, 943 F.2d at 241 ("demonstrable history of obstruction of justice on the part of the defendant[s] or others acting on [their] behalf" supports juror anonymity); see also United States v. Ochoa-Vasquez, 428 F.3d 1015, 1034 (11th Cir. 2005) ("anonymous jury may be justified even when the defendant has not attempted to interfere

with the current proceedings, if he belongs to a group that has a history of interfering with other judicial proceedings").

### III. The Use of an Anonymous and Partially Sequestered Jury Will Not Deprive the Defendants of the Opportunity for Meaningful Participation in Jury Selection or Diminish Their Presumption of Innocence

Once a district court determines that there is strong reason to believe that a jury needs protection, it may empanel an anonymous jury provided that it takes reasonable precautions to minimize any potential prejudice therefrom.  See Thai, 29 F.3d at 801; Amuso, 21 F.3d at 1264-65; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 239; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717-18; United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir. 1985).  A defendant has two legitimate concerns that are potentially affected by a decision to empanel an anonymous jury: (1) the right to make informed choices during the jury selection process, and (2) the right to be tried by jurors who are not prejudiced by reason of their anonymity.  Both of these concerns can be easily addressed.

### A.   Empaneling an Anonymous Jury Does Not Burden the Defendants' Ability to Make Informed Choices During Jury Selection

Although a defendant has the right to a meaningful voir dire of potential jurors, Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981), the decision as to the questions to be asked in voir dire largely rests within the informed discretion of the trial court.  United States v. Silva, 715 F.2d 43, 50 (2d

27

Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed); Barnes, 604 F.2d at 137-40 ("As long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal"). Indeed, as Judge Glasser has noted, "[t]he jury selection process (voir dire) is not a matter of constitutional dimension and the selection of an anonymous jury was implicitly held to be constitutional in Barnes." United States v. Gotti, 777 F. Supp. 224, 227 (E.D.N.Y. 1991) (citation omitted).

The information that will be kept from the parties and counsel if this motion is granted is not meaningful to the jury selection process. Names, exact addresses, and places of employment of the prospective jurors are not necessary to an informed choice of a jury panel. Information regarding the general neighborhoods in which the prospective jurors live and the general nature of their employment is sufficient. The names of prospective jurors, to the extent they provide information about ethnicity, are not relevant to meaningful voir dire. Georgia v. McCollum, 505 U.S. 42 (1992) (prohibiting use of peremptory challenges in racially discriminatory manner by criminal defendants). The use of juror questionnaires may further act to safeguard the rights of the defendants.

28

B.   The Court Can Explain the Reasons for
Anonymity and Partial Sequestration to
Prospective Jurors in Neutral Terms That Will
<u>Diminish the Risk of Prejudice to the Defendants</u>

Numerous courts have recognized that where anonymity is necessary, jurors can receive an instruction from the court explaining those measures in a neutral way in order to prevent the jury from drawing any negative inference.  Although the due process clause of the Fifth Amendment protects the presumption of innocence, "there is no <u>per se</u> rule that it may not be burdened." <u>Thomas</u>, 757 F.2d at 1364; <u>see also</u> <u>United States v. Scarfo</u>, 850 F.2d 1015, 1026 (3d Cir. 1988).  Here, the burden is slight compared to the Court's interest in safeguarding the integrity of the judicial process and can be alleviated through a proper jury instruction.

Most commonly, courts have explained to jurors that their privacy and their identities require protection from the media and the public.  <u>See</u>, <u>e.g.</u>, <u>United States v. Amato</u>, 306 Fed. App'x. 630, 2009 WL 59165, at *3 (2d Cir. Jan. 12, 2009) (summary order); <u>Thai</u>, 29 F.3d at 801; <u>Amuso</u>, 21 F.3d at 1265; <u>Tutino</u>, 883 F.2d at 1133.  In some cases, courts have explained the jury's partial anonymity by telling prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the personal questions asked in <u>voir</u> <u>dire</u> and in the jury questionnaires.  Either of those examples would

29

provide a credible explanation to prospective jurors in this case and would not prejudice the defendants.

As for partial sequestration, if ordered by the Court, the government proposes that the jury be told that transportation is being provided to protect their privacy and to ensure that the trial can proceed expeditiously.  This explanation has been routinely given in cases where transportation to and from court has been provided, including in the 2006 trial of two Bonanno soldiers and one associate in United States v. Amato, 03 CR 1382, before Judge Garaufis, and should be given here as well.  See also United States v. Nelson, No. 94-CR-823 (DGT) (E.D.N.Y.); United States v. Orena, No. 93-CR-1366 (ERK) (E.D.N.Y.); United States v. Malpeso, No. 93-CR-1365 (RJD) (E.D.N.Y.); United States v. Cutolo, No. 93-CR-1230 (EHN) (E.D.N.Y.); United States v. Thai, No. 91-CR-838 (CBA) (E.D.N.Y.).

CONCLUSION

  For the foregoing reasons, an anonymous and partially sequestered jury should be ordered in trial of this case.

Dated:  Brooklyn, New York
     February 13, 2012

           Respectfully submitted,

           LORETTA E. LYNCH
           United States Attorney
           Eastern District of New York
           271 Cadman Plaza East
           Brooklyn, New York  11201

Nicole M. Argentieri
Rachel Nash
Allon Lifshitz
Assistant U.S. Attorneys
  (Of Counsel)

31