

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NMA/RJN/AL

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 3, 2012

**By ECF & Facsimile**

The Honorable Sandra L. Townes
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Francis Guerra, et al.
Criminal Docket No. 10-0147 (S-4)(SLT)

Dear Judge Townes:

The government respectfully submits this letter to address the admissibility of the evidence on which the Court reserved decision during oral argument on June 1, 2012. In addition, the government seeks clarification from the Court with respect to its ruling regarding evidence relating to Joseph Lalima. Finally, the government respectfully sets forth additional details regarding the nature of Patrick Bombino's recorded statement about Michael Persico. In light of this proffer, which the government respectfully submits demonstrates that the recording is an admissible co-conspirator statement, the government respectfully requests that the Court reconsider its decision.

I. Conspiracy to Murder Joel Cacace

Attached as Exhibit 1 is a copy of a July 24, 2002 report by the Federal Bureau of Investigation of information provided by a cooperating witness (referred to as CW4 in the government's prior filings) related to the conspiracy to murder Joel Cacace. Briefly, CW4 is expected to testify that the defendant Theodore Persico, Jr., ("Persico, Jr.") became concerned that Joel Cacace, who was a high-ranking member of the Colombo family, was going to murder Frank Smith, who was a Colombo family associate that was assigned to Cacace at that time. Persico, Jr., planned to meet with Cacace and tell Cacace that Smith would now answer directly to Persico, Jr., instead of Cacace. Persico, Jr., directed CW4 to murder Cacace and the other individual with him, if Cacace objected to switching responsibility for Smith within the Colombo family from Cacace to

Persico, Jr. Persico, Jr., assured CW4 that he had enough power in the Colombo family to "deal with the consequences of killing two other Colombo [family] members." See Exhibit 1 at 19. The government respectfully submits that this testimony is admissible in order to prove the defendant's position in and association with the Colombo family in the late 1980s, which is critical background to the Scopo murder. Without such evidence, the jury will not be able to fairly evaluate testimony by other cooperating witnesses that Persico, Jr., had the power within the Colombo family to order the murder of Joseph Scopo.

This evidence is also important to show the relationship of trust CW4 shared with Persico, Jr., and members of his crew, which included the defendant Francis Guerra. It is important background to this relationship, which is important to put in context Guerra's admissions to CW4 regarding his participation in the murder of Michael Devine. Accordingly, the government respectfully submits that this testimony is admissible, not pursuant to Fed. R. Evid. 404(b), but for the other reasons cited herein.

II. The Murder of Bruce Black

As set forth in more detail below, the conspiracy to murder Bruce Black is related to the charged racketeering conspiracy for the following reasons: (1) the cooperating witness Kenneth Geller understood that Michael Persico ("Persico") had the authority within the Colombo family to direct other members and associates to kill Black on Persico and Geller's behalf; (2) the evidence contributes to Geller's basis for fearing Persico, which is an important part of the proof relating to Racketeering Acts One and Two; and (3) Persico conspired to murder Bruce Black in order to make money for the Colombo family.

Geller is expected to testify that, based on his conversations with Persico, he understood Persico to be responsible for earning money to keep the Colombo family prosperous. Geller is further expected to testify that between the 1980s and 1991, he was involved in the Colombo family in several ways. Primarily, he was a loansharking victim of Persico and others, and as a result, owed substantial sums of money to Persico. For this reason, Geller is the victim identified as John Doe #1 in Racketeering Acts One and Two, which allege that Persico engaged in extortionate extension and collection of credit. Second, Geller had invested substantial sums of money in business ventures operated by Michael Persico and others in the Colombo family. For example, among other things, Geller and Persico invested in a condominium which they rented to another

individual at the direction of Alphonse Persico, who was incarcerated at the time. Third, while borrowing money from Michael Persico, Geller had, at the same time, loaned money to others referred to him by Persico. Geller did so with the understanding that he and Persico would share the interest payments and that Colombo family resources would be used to ensure repayment of these loans.

During this time period, Geller invested money with Bruce Black and subsequently lost money on the investment. Geller sought Persico's assistance, and advised Persico that he was the beneficiary of Black's life insurance policy. Persico offered to arrange for Black's murder, and Geller understood that Persico's ability to carry out this plan was a result of his powerful position in the Colombo family. Moreover, any money Geller received would be shared with Persico as part of their joint involvement in the Colombo family.

Thus, the murder conspiracy is evidence of Persico's position in and association with the charged enterprise (which will be disputed by the defendant at trial), the pattern of racketeering activities in which Michael Persico engaged, and his ability to use the Colombo family resources to further his own interests, as well as the interests of his associates.

Moreover, to prove Racketeering Acts One and Two, the government is required to establish that extortionate means were use in extending and collecting the loans to Geller. To prove that element, the government intends to elicit testimony from Geller establishing that he was afraid of the consequences of failing to repay Michael Persico the money he owed. Geller is expected to testify that his discussions about Black with Persico contributed to his fear of Persico because it confirmed for Geller that Persico was a powerful associate in the Colombo family and that he had the resources of the Colombo family at his disposable to engage in violence and was willing to use those resources to punish those who did not repay him. The jury cannot fairly evaluate Racketeering Acts One and Two without this evidence.

III. Joseph Lalima

Based upon the Court's rulings at the status conference, the government understands that it is not permitted to introduce evidence of Persico's statements regarding Lalima's

watch. However, the government seeks clarification as to whether it will be permitted to introduce evidence relating to Persico's involvement in threatening Lalima because of Lalima's failure to pay money owed to Persico. The government respectfully submits that this conduct directly relates to the charged racketeering conspiracy, Persico's association with that racketeering conspiracy and also establishes Geller's basis for fearing Persico, which is critical evidence of Racketeering Acts One and Two. For these reasons, the government seeks permission to elicit the facts set forth below, but consistent with the Court's ruling, will not elicit the subsequent conversation regarding Lalima's watch.

Geller is expected to testify that Lalima's linen company was among Persico's business ventures in the late 1980s or 1990, ventures Persico engaged in to earn money not only for himself, but also for the Colombo family. Geller is further expected to testify that Persico became upset when he did not receive the expected proceeds from Lalima's business. Persico sought Geller's assistance in determining the cash flow of the business, so that Persico could determine how much money he was owed, and where that money had gone. When Geller reported that Lalima was uncooperative, Persico advised that he would instruct Lalima to be forthcoming. When Geller reported that Lalima still did not provide sufficient information about the company's finances, Persico called Geller to a meeting, attended by Theodore Persico, Sr., and Frank Sparaco, an influential member and associate, respectively, of the Colombo family. Geller's understanding is that the meeting was orchestrated by Persico. At that meeting, which Persico attended, Theodore Persico, Sr., threatened Lalima and directed him to cooperate with Geller's investigation of the company's cash flow.

Persico's involvement with Lalima was directly related to the racketeering conspiracy, as it was yet another investment made for the purpose of earning money not just for himself, but also for the criminal enterprise. Moreover, Persico's decision to involve other members and associates to threaten Lalima about the consequences of failing to cooperate and pay what was owed is further evidence of Persico's position in the Colombo family and the pattern of racketeering in which he engaged. Moreover, as with the evidence relating to Bruce Black, Geller's experience regarding Lalima contributed to his fear of Persico, which is an important element of the proof relating to Racketeering Acts One and Two. Finally, the government expects that the defense will

seek to impeach Geller's testimony regarding his fear of Persico. In order to rebut their argument that Geller has exaggerated or fabricated this fear, the government respectfully submits that it should be permitted to present the evidence establishing the basis for this fear.

IV. Michael Persico's Involvement in Loansharking

Although, in an abundance of caution, the government included Persico's involvement in loansharking in its motion to admit evidence of other criminal acts, the evidence the government seeks to admit is really integral to the proof of Racketeering Acts One, Two and Five. Moreover, the evidence at trial will establish that lending money at exorbitant interest rates or using the threat of harm for failure to repay loans, regardless of their interest rates, are ways in which the Colombo family earns money for its participants and for the enterprise as a whole. Thus, Persico's involvement in these activities is evidence of his participation in the enterprise, his use of the resources of the enterprise, and the pattern of racketeering alleged.

As set forth above, Persico's involvement in using extortionate means to extend credit to and collect credit from Geller is alleged in Racketeering Acts One and Two. Similarly, in Racketeering Act Five, Persico's involvement in using extortionate means to extend credit to and collect credit from Anthony Russo is alleged. In addition, Racketeering Act Five also alleges that Persico financed Russo's loansharking activities, knowing that Russo himself would use extortionate means to collect the debt. In another words, Persico loaned money to Russo, who understood the dangerous consequences of failing to repay that money to Persico. In turn, Russo loaned the money to others, using the same extortionate means he knew he could suffer if he failed to repay Persico.

The evidence the government seeks to admit is intertwined with these allegations. With respect to Racketeering Acts One and Two, in order to provide context for the charged conduct, Geller is expected to testify that Persico lent money to others using his position in the Colombo family to ensure that the debtors understood the potential consequences of failing to repay. Indeed, on at least one occasion, Geller himself lent money to another individual on Persico's behalf. At the same time, Geller was making interest payments to Persico on money he

had borrowed, and is expected to testify that he tried never to miss a payment for fear of the consequences.

Similarly, Russo is expected to testify that he borrowed money from Persico, in part because he understood Persico to be engaged in the business of lending money using extortionate means to earn money for the Colombo family. This conduct is charged as Racketeering Act Five. Russo is expected to testify that he and defendant Guerra borrowed money from Persico at an extortionate interest rate and lent it out to others. Russo is further expected to testify that when he and Guerra had trouble collecting from their customers, and therefore had trouble repaying their own loans to Persico, Persico directed them to use all means necessary to get the money back. This testimony is necessary to complete the story of the charged crime.

Russo is further expected to testify that he understood Persico to lend money to other associates of the Colombo family in order to insulate himself from law enforcement scrutiny because individuals associated with organized crime would be less likely to complain to law enforcement. For example, Persico directed Russo to collect money from Robert Tarantola, a Colombo family associate, on at least two occasions. This testimony is important to establish Persico's position of authority in the Colombo family in 1990s, his association with the Colombo family enterprise and is directly relevant to the pattern of racketeering activity he engaged in on the Colombo family's behalf.

Russo is also expected to testify that he was at a social function with Michael Persico, Robert Tarantola, the defendant Guerra and others, all of whom were associates of the Colombo family at the time. At the end of the meal, members of the group discussed how much money they each owed to Persico in loanshark debt, which totaled over $600,000. As alleged in the Indictment, the Colombo family exists to make money and one of the ways it makes money is through loansharking, including to associates of the family, who often then lend that money to other individuals. Russo's testimony that Persico had loaned over $600,000 to associates of the Colombo family, including himself, is admissible not only as evidence pursuant to Federal Rule of Evidence 404(b), but as evidence of the Colombo family enterprise, Persico's position in that enterprise and the charged pattern of racketeering. At trial, Persico will likely seek to

portray himself as a legitimate businessman who is being persecuted merely for his last name. This evidence is critical to rebut those arguments because it demonstrates his position of authority in the Colombo family, and also because it shows how Persico sought to insulate himself and his involvement in criminal activity from law enforcement scrutiny in order to keep up his "appearance" as a legitimate member of society.

## V. Extortion of Roger Califano

The Court has admitted testimony of cooperating witness Russo regarding the collection of tribute payments from a Colombo family associate, Roger Califano, but has reserved decision on the admissibility of the recording containing statements made by Russo about this extortion that were made prior to the time Russo became a cooperating witness. Below, the government addresses the admissibility of that recording. Copies of the recording and transcript are attached as Exhibit 2 and Exhibit 2T.

Russo's recorded statements are not hearsay because they fall squarely within the definition of co-conspirator statements, made during and in furtherance of the conspiracy, that are admissible when introduced against other members of the conspiracy. Fed. R. Evid. 801(d)(2)(E). The rule provides that a statement "offered against an opposing party" that "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay.

In order to admit a statement pursuant to this Rule, the Court must find by a preponderance of the evidence that a conspiracy existed between the declarant (i.e. Russo) and the defendants (i.e. Michael Persico and Theodore Persico, Jr.) and that the statement was made during and in furtherance of the conspiracy. See, e.g., United States v. Orena, 32 F.3d 704, 711 (2d Cir. 1994); United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990); Bourjaily v. United States, 483 U.S. 171, 175 (1987)). If those requirements are satisfied, the statements are admissible at trial as non-hearsay, regardless of whether the declarant testifies.

In addition, the Confrontation Clause is not implicated. Under Crawford v. Washington, 541 U.S. 36, 61-62 (2004), a declarant's testimonial out-of-court statement is inadmissible at trial, even if it falls within a hearsay exception, unless the declarant is unavailable and the opposing

party had a prior opportunity to cross-examine him. However, if the statement is not testimonial, and falls within a hearsay exception, then it is admissible regardless of whether the declarant testifies. Davis v. Washington, 547 U.S. 813, 817-18 (2006).

The Second Circuit has explicitly held in United States v. Burden, 600 F.3d 204 (2d Cir. 2010) that statements recorded by a cooperating witness are not testimonial. Those statements are thus admissible whether or not the cooperating witness, or the individual whom he recorded, testify at trial. Similarly, in United States v. Fahane, 634 F.3d 127, 161-162 (2d Cir. 2011), the Second Circuit specifically held that recordings of the defendant's co-conspirators made by a cooperating witness were admissible, despite the fact that the co-conspirators were not available for cross-examination, because those statements are not testimonial. The Court explained:

> [The defendant] submits further that [the co-conspirator's] recorded statements were inadmissible under Rule 801(d)(2)(E) because they were not made in furtherance of the conspiracy, but instead were "idle chatter." We are not persuaded. [The co-conspirator] was plainly seeking to persuade someone whom he thought could admit him to al Qaeda that he and [the defendant] were trustworthy and would, in fact, provide material assistance to that organization. That [the co-conspirator's] statements were sometimes vague and rambling does not alter the fact that, in their entirety, they were made in furtherance of an agreement with [the defendant] to provide material support for terrorism. In any event, [the defendant] does not show that any possible digressions from the conspiratorial purpose in [the co-conspirator's] statements were prejudicial . . . . [The defendant's] reliance on Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, to mount a Confrontation Clause challenge to the receipt of [the co-conspirator's] statements is foreclosed by United States v. Saget, 377 F.3d 223 (2d Cir. 2004), in which this court

> held that "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of Crawford," id. at 229. As then-Judge Sotomayor explained in writing for the Saget panel, Crawford instructs that the critical factor in identifying a Confrontation Clause concern is "the declarant's awareness or expectation that his or her statements may later be used at a trial." Id. at 228. Here, there is no question that in his conversations with [the cooperating witness/undercover], [the co-conspirator] was unaware that he was speaking to agents for the government or that his statements might later be used at a trial. Because [the co-conspirator's] recorded statements are thus not testimonial in nature, this case is on all fours with Saget, and [the defendant's] Confrontation Clause challenge fails.

Fahane, 634 F.3d at 161-162 (citations omitted); see also, United States v. Logan, 419 F.3d 172, 178 (2d Cir. 2005) ("In general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial."); United States v. Dupree, 10-CR-628 (KAM), 2011 WL 5884219, at *17 (E.D.N.Y. Nov. 23, 2011) (holding that the recorded statements of the defendant's co-conspirators to a cooperating witness were admissible at trial because they were non-hearsay pursuant to Fed. R. Evid. 801(d)(2)(E) and did not violate the defendant's right to confrontation as interpreted in Crawford).

Here, the evidence establishes beyond a preponderance that Russo, Persico, Jr., and Persico were participants in a racketeering conspiracy for the benefit of the Colombo family, and that, as part of that conspiracy, they collected tribute payments from other members and associates such as Califano. The testimony at trial is expected to establish that Califano was an associate of the Colombo family who made yearly tribute payments to the street boss of the Colombo family, Thomas Gioeli. When Califano sought to reduce the payments owed, Russo intervened on his behalf. However, as reflected in the recorded statements, Russo's intervention was unsuccessful, and he was advised by Persico and Persico, Jr., that the amount Califano owed would not

be reduced. Russo's communication of this result to Califano furthered the conspiracy because he was ensuring that Califano was aware of what the other members of the conspiracy expected him to do. While Russo advised that he would continue to represent Califano's interests, it was critical for Califano to understand the amount of money he was expected to pay to the family. This evidence is also admissible to establish Persico and Persico, Jr.'s position in the charged enterprise and the pattern of racketeering activity in which they engaged, which included collecting tribute payments from associates of the Colombo family.

Thus, in addition to Russo's testimony at trial, his recorded statements, which were made while he was a co-conspirator in the racketeering enterprise and in specific criminal activities to further the interests of that enterprise, such as collecting tribute payments from people like Califano, are admissible pursuant to Fed. R. Evid. 801(d)(2)(E). Indeed, such recorded statements are admissible independent of Russo's trial testimony, pursuant to the case law set forth above. Moreover, it is expected that the defendants will seek to impeach Russo's credibility and argue that he has implicated the defendants in the criminal enterprise only after he was arrested. Russo's prior recorded statements would be admissible to rebut the claim that Russo fabricated his testimony after cooperating and/or to rebut more general attacks on Russo's credibility. Fed. R. Evid. 801(d)(1)(B); United States v. Rivera, 60 Fed. Appx. 854, 860 (2d Cir. 2003) (prior consistent statement of a witness is admissible if the opposing party suggests the witness's testimony is false or the product of improper influence or motive and the prior consistent statement was made prior to the alleged motive to falsify).

## VI. The Organized Crime Meeting in Florida

With respect to the extortion of an individual related to John Staluppi in Florida, the government expects that a cooperating witness, who was a captain in the Colombo crime family, will testify as follows. He was asked by Michael Persico to help someone in Florida who was involved in a dispute. That person was related to John Staluppi. Trial testimony is further expected to establish that Staluppi is one of Persico's close associates who provides a portion of the money his businesses earn to the Colombo family. The cooperating witness is further expected to testify that the dispute was between Staluppi's

relative and individuals affiliated with the Gambino crime family, that the cooperating witness attended the meeting with Gambino representatives, and that ultimately, he was unable to assist Staluppi's relative because the members of the opposing crime family advised that Staluppi's relative had already gone to the police, thereby breaking a basic organized crime rule to resolve disputes without law enforcement intervention. The cooperating witness subsequently advised Persico of this result, and Persico acknowledged that he already knew. Persico's effort to assist Staluppi's relative through organized crime channels, rather than through legitimate law enforcement channels, is further evidence of his involvement in the enterprise and of his use of the crime family's resources to protect those who provide financial support to the family. The fact that the dispute was with another crime family augments this conclusion.

VII. Gallo

Pursuant to the Court's request, the recorded conversation among Russo, Persico, Jr., and a cooperating witness (Thomas McLaughlin) is attached as Exhibit 3 and a transcript of that recording as Exhibit 3T. This evidence is directly related to the racketeering enterprise because it establishes the retaliatory measures that the defendant Persico, Jr., takes to punish associates who he believes are disloyal. It further demonstrates Persico, Jr.'s position in the enterprise and his ability to direct other members and associates to retaliate on his behalf.

To summarize, Russo is expected to testify that Larry Gallo was an associate of the Colombo family. Persico, Jr., assisted Gallo by getting him a job at Bella Luna and then La Bella, restaurants owned by Persico and operated for the benefit of the Colombo family. Persico, Jr., believed that Gallo stole money from the restaurant, and, instead of reporting the crime to the police, directed McLaughlin to have Gallo assaulted and to take his watch and car, which Persico, Jr., planned to destroy to get insurance money. Thus, the government respectfully submits that Russo's testimony about this conduct, and the recording of Persico Jr.'s own statements, are admissible at trial to prove Persico Jr.'s position in the charged enterprise and the methods he uses to ensure loyalty and punish those who are disloyal to the criminal enterprise.

VIII. Patrick Bombino

The government respectfully sets forth the explanation below regarding Patrick Bombino's ("P. Bombino") recorded statement about Persico in order to ensure that a complete proffer regarding the admissibility of the statement is before the Court. For the reasons set forth below, the government respectfully requests that the Court reconsider its decision with respect to the statement P. Bombino made about Persico because the recording is proof of Persico's involvement in the Colombo family war and his influence in the Colombo family, which are central to proving Persico's involvement in the pattern of racketeering alleged.

P. Bombino's statements during the September 15, 2009 recorded conversation the government seeks to admit are co-conspirator statements made in furtherance of the conspiracy, and are therefore admissible pursuant to the case law set forth above in Section V. The government has attached a copy of the recorded conversation as Exhibit 4 and the corresponding transcript as Exhibit 4T.

The government will establish by more than a preponderance of the evidence that P. Bombino was one of Persico's and Persico, Jr.'s co-conspirators in the racketeering conspiracy and in criminal conduct in furtherance of that conspiracy. The cooperating witness Steven Marcus is expected to testify that P. Bombino is a long-time associate of the Colombo family with close ties to Persico, Jr., and committed crimes with the Colombo family. For example, P. Bombino was one of the investors in All Around Trucking, the trucking company that was operated for the benefit of the Colombo family and that engaged in embezzlement of union funds for the Colombo family's benefit, as alleged in Racketeering Act 15. As a result of his involvement in All Around Trucking, P. Bombino was also involved in paying a bribe to an employee of Testa corporation, the subject of Racketeering Act 17, in an effort to ensure that the Colombo-run trucking company obtained lucrative contracts with Testa. He participated in discussions regarding the extortion of Testa corporation, the subject of Racketeering Act 19, when Testa failed to pay All Around for the work All Around performed. Moreover, Marcus will testify that P. Bombino was involved in the extortion of furniture store owners, the subject of Racketeering Act 18. Specifically, P. Bombino and James Bombino ("J. Bombino"), along with Persico, loaned money to the furniture

store owners. They then proposed to Persico that J. Bombino take over the store until the owners repaid their debts, a scheme that Persico subsequently implemented.

Therefore, P. Bombino's statements are admissible against the defendants if they were in furtherance of that racketeering conspiracy. The government respectfully submits that P. Bombino's statements furthered the racketeering conspiracy by ensuring that Marcus and J. Bombino are educated on the importance of loyalty to the Persico family and about the influence that Persico has over the family's affairs. While the defendants characterized P. Bombino's comments as idle chatter in the midst of conversation unrelated to the racketeering conspiracy, that is not the case. In the conversation on September 15, 2009 (Exhibit 4), P. Bombino is discussing All Around Trucking, in which Persico was an investor, and is determining whether Persico will continue to support the business. P. Bombino advises Marcus and J. Bombino about how to determine whether their business will continue to receive Colombo family support, and further advises them on how Persico earns money for the Colombo family by collecting money from various businesses associated with the enterprise. He further advises that J. Bombino and Marcus will benefit by having Persico as their "rabbi," in other words, as someone who can provide the protection and resources of the Colombo family, resources which include the relationship with Thomas Petrizzo, a Colombo family captain with powerful influence over demolition companies on which All Around relies for business. This is the context in which P. Bombino refers to the Colombo War, and advises J. Bombino and Marcus that Persico saved Petrizzo's life, despite the fact that Petrizzo opposed the Persico faction during the Colombo War. The comment was made to ensure that J. Bombino and Marcus understood Persico's important influence over the Colombo family's affairs, and conducted themselves accordingly. His statement served to advise them that, despite his own objections to the manner in which Persico was conducting business, they needed Persico's support to be successful.

IX. Conclusion

For these reasons and for the reasons previously set forth in the Government's motion dated May 8, 2012 and letter dated May 25, 2012, the government respectfully submits that the evidence it seeks to admit relates to Persico's and Persico Jr.'s involvement in the pattern of racketeering alleged, their

position of influence in the enterprise, their ability to use the resources of the enterprise to further their own monetary goals, as well as the monetary goals of their associates and the enterprise as a whole, and their ability to instill fear in the individuals identified as victims in the indictment.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: /s/
Nicole M. Argentieri
Rachel M. Nash
Allon Lifshitz
Assistant U.S. Attorneys

cc: Defense Counsel (by ECF)